Ervan PURNELL, Plaintiff–Appellant,

v.

Elaine A. LORD, Walter E. Kelly,
Defendants–Appellees.

No. 83, Docket 91–2164.

United States Court of Appeals,
Second Circuit.

Argued Aug. 26, 1991.

Decided Jan. 3, 1992.

Harold A. Kurland, Rochester, N.Y. (Glenn T. Marrow, Nixon, Hargrave, Devans & Doyle, of counsel), for plaintiff-appellant.

Martin Hotvet, Asst. Atty. Gen. of State of N.Y., Albany, N.Y. (Robert Abrams, Atty. Gen., Peter H. Schiff, Deputy Sol. Gen., and Peter G. Crary, Asst. Atty. Gen., of counsel), for defendants-appellees.

Before OAKES, Chief Judge, FEINBERG and CARDAMONE, Circuit Judges.

CARDAMONE, Circuit Judge:

In this prisoner's rights case involving inmate-to-inmate correspondence, appellant's privilege to correspond with another prisoner in a different facility was revoked. As a result, appellant sued state prison officials claiming his constitutional rights under the First and Fourteenth Amendments had been violated. We understand that male and female prisoners alike often suffer from anomie; and that, for the anxious and isolated person, writing to someone similarly situated helps alleviate their condition and, as a therapeutic tool, advances the goal of prisoner rehabilitation. Yet, like other prisoner privileges, it is subject to restrictions that are shown to be reasonably related to legitimate institutional concerns, such as security. Here, it was for such security reasons that the privilege to correspond was revoked.

Appellant Ervan Purnell appeals from the March 11, 1991 order of the United States District Court for the Western District of New York (Telesca, J.) denying his motions for judgment notwithstanding the verdict and for a new trial in his action against defendants Elaine A. Lord and Walter E. Kelly, Superintendents of Bedford Hills and Attica State Correctional Facilities, respectively. Purnell contends that: (1) the district court improperly dismissed the action against defendant Kelly; (2) judgment should have been granted in his favor on his First Amendment claim; (3) the district court erred in refusing to submit his Fourteenth Amendment due process claim to the jury; (4) testimony regarding the nature of his correspondent's crime should have been excluded; and (5) external circumstances before jury deliberations deprived him of a fair trial. We agree with the district court's disposition of

appellant's First Amendment claim. But the Fourteenth Amendment claim was dismissed on the basis that there was no "liberty" interest implicated. Although we think the district court reached the right result, our reasons for coming to the same conclusion, as the following discussion discloses, are somewhat different.

## FACTS

On August 21, 1984 Purnell, an inmate at Attica, was given authorization to correspond with Carrie Chandler, a female inmate at Bedford Hills. At the time inmate-to-inmate correspondence was governed by New York Department of Correctional Services Directive 4422 that required inmates desiring to correspond with one another to secure the approval of the superintendents of both prisons.

Purnell and Chandler established a regular pattern of correspondence, developing a close personal relationship that led to Chandler relating to Purnell the difficulties she was experiencing in her employment at the Bedford Hills law library. These stemmed from an ongoing conflict with Officer Collins, a corrections officer assigned to the library. Learning of Chandler's problems prompted Purnell to write a letter dated February 22, 1985 to defendant Lord, as Superintendent of Bedford Hills, which stated in relevant part

> ... Now I ! Am asking you, and asking you this one time only ! Tell the Jerk ! Collins to behave himself and you see to it that he does as well as any ! Other officer, because, if ! I hear tell of Ms. Chandler being harrassed in any manner again, heads will roll. Now try me, her man.... P.S. Remember ! you or that asshole Collins, is not ! UNTOUCHABLE.

When Superintendent Lord received Purnell's letter she unilaterally revoked his correspondence privilege as to Chandler because she perceived a potential threat to institutional security. Lord forwarded a copy of the letter to the Superintendent of Attica, advising him that approval for Purnell's correspondence with Chandler had been withdrawn. Upon receipt of Lord's letter, defendant Walter E. Kelly, Superintendent of Attica, confirmed the termination of the correspondence privilege.

Thereafter, on June 10, 1985 Purnell commenced the instant § 1983 action *pro se*, alleging that revocation of his correspondence privilege by Superintendents Lord and Kelly had deprived him of his First and Fourteenth Amendment rights. Defendants filed a motion for summary judgment and Purnell cross-moved for the same relief in June 1988. On January 11, 1989 the district court denied both motions, set a date for trial, and appointed *pro bono* counsel to represent Purnell.

At the start of the first day of the jury trial on January 15, 1991 defendants moved to dismiss the action against defendant Kelly because, according to Directive 4422, which required the approval of both superintendents for correspondence privileges, the revocation of correspondence approval by defendant Lord was determinative. Purnell opposed dismissal on the grounds that it was inconsistent with the court's denial of summary judgment, and that a trial was required as to defendant Kelly both on the First Amendment and Fourteenth Amendment due process grounds. In an oral ruling, the district judge granted defendants' motion stating that because Purnell had failed to establish a liberty interest protected by the Fourteenth Amendment, the only claim that would be presented to the jury was the First Amendment claim, the resolution of which hinged solely on Lord's actions.

At trial, Superintendent Lord testified she revoked Purnell's correspondence privilege because of what she perceived as a potential for violence in his correspondence with Chandler. She stated that she viewed the letter to her as "inflammatory" and as "an absolute threat to myself and Officer Collins." She further testified that:

> I revoked the correspondence because ... I believed that there was a potential that I didn't know who Mr. Purnell knew. I didn't know if he knew people at Bedford.
>
> But in addition to that I was very concerned. I knew Carrie and I knew

her to be sometimes depressed, sometimes emotional, explosive, and I knew her background, and I was very concerned about the potential for violence. With respect to Chandler's potential for violence, Lord testified that Chandler was incarcerated "for attempted murder. She struck a man in the back with an axe, and then when he survived she got two teenagers to try to shoot him."

At the close of the evidence the district court denied Purnell's motion for a directed verdict on the issue of liability. Consistent with its earlier ruling on the dismissal motion, the trial court refused to charge the jury on Purnell's alleged Fourteenth Amendment due process claim, instructing it only with respect to the First Amendment claim against Lord. The jury was then told to return the following morning to begin deliberations.

On the morning of January 17, 1991, when counsel, the parties, and the jury were gathering for the start of jury deliberations, a bomb scare emptied the courthouse. When court reconvened the following morning, the trial judge repeated a portion of his charge and sent the jury to deliberate. It returned later that same morning with a verdict, answering "no" to the special interrogatory "Do you find that the civil rights of plaintiff Ervan Purnell were violated by the acts or conduct by the defendant?" Judgment was entered in accordance with this verdict. Purnell filed motions, pursuant to Fed.R.Civ.P. 50(b) and 59(a), to set aside the jury verdict and to enter judgment n.o.v. on defendant Lord's liability under the First Amendment and for a new trial on all remaining issues. These motions were denied in an order dated March 11, 1991. It is from this order that Purnell appeals.

## DISCUSSION

### I The First Amendment Claims

■ As an initial matter, Purnell's First Amendment claim was properly dismissed as to defendant Kelly. According to Directive 4422 Purnell's correspondence privilege with Chandler was dependent on the approval of both Superintendents Lord and

Kelly. Superintendent Lord's decision that the correspondence privilege should be terminated was determinative, and no action on defendant Kelly's part was necessary to effectuate Lord's decision. Consequently, nothing done by Superintendent Kelly had any bearing on Purnell's First Amendment rights.

Turning next to review the denial of Purnell's motion for judgment n.o.v. on his First Amendment claim against Superintendent Lord, we must determine " 'whether the evidence, viewed in the light most favorable to the party that secured the verdict, was sufficient to allow a reasonable juror to arrive at the verdict rendered.' " *Vasbinder v. Ambach*, 926 F.2d 1333, 1339 (2d Cir.1991) (quoting *Schwimmer v. SONY Corp. of America*, 677 F.2d 946, 952 (2d Cir.), *cert. denied*, 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982)). In making this determination, deference is given to all credibility determinations made by the jury and to all reasonable inferences from the evidence that the jury might have drawn in favor of the prevailing party. *See Auwood v. Harry Brandt Booking Office, Inc.*, 850 F.2d 884, 889 (2d Cir.1988); *Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 712 (2d Cir.1983); *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970). Analyzed in this light, judgment n.o.v. may not be granted unless "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 168 (2d Cir.1980).

■ The substantive law to be applied to Purnell's First Amendment claim is well established. Prison restrictions that implicate prisoners' constitutional rights—including First Amendment rights—may be upheld only if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987); *Thornburgh v. Abbott*, 490 U.S. 401, 409, 109 S.Ct. 1874, 1879, 104 L.Ed.2d 459 (1989). *See also Fromer v. Scully*, 874 F.2d 69, 72 (2d Cir.

1989); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989). In *Turner,* the Supreme Court listed several factors a court must consider in undertaking this inquiry: (1) whether there is a rational connection between the restriction and the legitimate governmental interest used to justify it; (2) whether alternative avenues of exercising the right remain open to the inmate; (3) whether accommodation of the right will have an adverse impact on guards, other inmates, and prison resources generally; and (4) whether obvious, easy alternatives to the restriction exist. *See* 482 U.S. at 89–90, 107 S.Ct. at 2261–62. The district court explicitly included these factors in its charge to the jury.

■ Purnell contends that the evidence at trial showed that the revocation of his correspondence privilege was not content neutral, failed to advance any goal of institutional security or safety, and was not a reasonable response to his actions. It is clear that revocation of Purnell's correspondence privilege was rationally connected to the legitimate governmental interest in institutional security. And because, as established by Superintendent Lord's testimony, her action was taken as a result of concern for such security, it cannot be argued that the challenged restriction was not content neutral. Nor was Purnell deprived of all means of expression, rather communication was barred only with respect to Chandler—as to whom prison officials had particular cause for concern. Additionally, accommodation of Purnell's asserted First Amendment right to communicate with her could threaten the safety of guards and prisoners at both institutions and thus would have an adverse impact on institutional interests. Moreover, monitoring their correspondence is not an obvious or easy alternative to terminating the privilege.

Given the obviously threatening nature of Purnell's letter, the evidence relating to Chandler's potential for violence, and the possibility of incitement through correspondence with Purnell, it can scarcely be said

that the jury's verdict was the result of conjecture. Hence, Purnell's motion for judgment n.o.v. against defendant Lord on his First Amendment claim was properly denied.

## II The Due Process Claims

Purnell next contends that he is entitled to a new trial because it was error to refuse to submit his due process claim against defendant Lord to the jury, and to dismiss the same action against defendant Kelly. In its oral ruling granting defendants' motion to dismiss the action against defendant Kelly, the district court held that Purnell had failed to establish a liberty interest in inmate-to-inmate correspondence sufficient to give rise to due process protection. It found that neither the Constitution nor the state regulations governing such correspondence established the required liberty interest.

The Fourteenth Amendment mandates, in part: "nor shall any State deprive any person of life, liberty, or property without due process of law." In ruling as a matter of law that there was no constitutionally protected liberty interest in inmate-to-inmate correspondence at the time Purnell's claim arose, the district court effectively determined that Superintendents Kelly and Lord were entitled to qualified immunity since no construction of the facts could demonstrate that in 1985 they had violated Purnell's established right to correspond with another inmate. *See Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir.1988). Because we find that Purnell's due process claims under the Fourteenth Amendment were properly dismissed on the grounds of qualified immunity, it is unnecessary for us to address or decide whether a liberty interest in inmate-to-inmate correspondence existed at that time under the Due Process Clause or the governing regulations. Instead, we need only decide whether a liberty interest had been clearly established at that time.

■ The doctrine of qualified immunity serves to shield public officials, such as these defendants, from liability in § 1983 actions "insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). In order for a right to be "clearly established," "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *accord Fox v. Coughlin*, 893 F.2d 475, 477 (2d Cir.1990) (per curiam); *Eng*, 858 F.2d at 895 ("the boundaries of the supposed 'right' must be sufficiently definite so that the official understood that his actions violated it").

■ Thus, we must determine whether it was "sufficiently clear" at the time Purnell's correspondence privilege with Chandler was revoked that a constitutionally protected right to so correspond existed. A liberty interest protected by the Due Process Clause may arise from two sources—the Due Process Clause itself and state law. *See Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989); *Hewitt v. Helms*, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). Purnell places great reliance on *Procunier v. Martinez*, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), as establishing a constitutional liberty interest in inmate correspondence. This reliance is misplaced because *Procunier* explicitly disclaimed consideration of "prisoners' rights," and premised its ruling instead on the rights of *non-prisoners* in uncensored mail communications with inmates. *Id.* at 408–09, 94 S.Ct. at 1808–09. Hence, a liberty interest of *inmates* to correspond with non-inmates was not clearly established in that case, much less a liberty interest of inmates to correspond with other inmates.

■ Further, subsequent decisions of the Supreme Court have limited the application of *Procunier*. *See Thornburgh*, 490 U.S. at 413–14, 109 S.Ct. at 1881–82. In *Turner*, though recognizing that inmates do not by virtue of their status automatically lose the protections of the Constitution, the Supreme Court nonetheless upheld a regulation that prohibited all inmate-to-inmate correspondence except that involving legal matters or family members. *See* 482 U.S. at 93, 107 S.Ct. at 2263. This subsequent case law is relevant to our inquiry into the existence of an established liberty interest in 1985. *See Francis v. Coughlin*, 891 F.2d 43, 48 (2d Cir.1989). To the extent decisional law may be said to have created a protected liberty interest in inmate-to-inmate correspondence, qualified immunity nonetheless protects these defendants from liability because, in our view, an inmate did not have the requisite "clearly established" liberty interest in corresponding with an inmate at another correctional facility so as to give rise to a due process claim against prison officials for its cancellation.

■ Alternatively, Purnell contends that Directive 4422 created a liberty interest in his correspondence giving rise to due process protection. But this proposition is also unavailing since for a state regulation to create a protected liberty interest, it must contain "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed." *Hewitt*, 459 U.S. at 471, 103 S.Ct. at 871. It is only through "the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates" that such a right arises. *Id.* at 472, 103 S.Ct. at 871. Purnell relies on Directive 4422's general policy statement as establishing a protected right. But this states only that "[t]he sending and receiving of mail by inmates will be restricted only to the extent necessary to prevent physical injury to persons, maintain security and good order in the facilities, and prevent interference in the general public order." Neither this provision nor more specific provisions explicitly governing inmate-to-inmate correspondence contain language "requiring specific substantive predicates" to be followed in connection with the establishment or revocation of an inmate's authorization to correspond with another inmate.

Section III.B.1.b. of Directive 4422 states, for example, that for an inmate to

correspond with an inmate of another correctional institution authorization from the superintendents of both institutions concerned must be obtained. Section III.C.1. provides that such correspondence requests "will be investigated by both facilities to determine that the exchange of such correspondence will not create problems relating to the safety, security, and good order of the facilities." Similarly, Section III.C.2. of Directive 4422 states that "[a]uthorization may be withdrawn by the Superintendent in particular cases when evidence is found in the correspondence relating to" specified prohibited conduct.

We believe that the discretion of prison officials is not sufficiently curtailed by these regulations for us to find that they "clearly establish" a protected liberty interest. While setting out general standards by which to evaluate the granting or revocation of inmate-to-inmate correspondence authorizations, the cited rules do not delineate substantive predicates so that it can be said that a particular result is mandated under the rules. Nor do the regulations unambiguously limit the instances in which that discretion may be exercised; for example, Section III.C.2 contains no language dictating that *only when* it is satisfied may a superintendent exercise the granted discretion. This section merely lists non-exclusive bases upon which a superintendent may rely in revoking an inmate's privilege to correspond with another inmate. Thus, the fact that the threat found sufficient by Lord to warrant revocation of Purnell's privilege was not in a letter *to another inmate* is not dispositive.

Consequently, in light of the substantial doubt regarding the existence of a liberty interest under these regulations, and thus because a constitutional right to inmate-to-inmate correspondence cannot be found to have been "clearly established" at the time Purnell's correspondence privilege was revoked, qualified immunity protects Superintendents Kelly and Lord as a matter of law from liability. It was therefore proper to dismiss appellant's due process claim against defendant Kelly and to refuse to charge the jury as to such claim against defendant Lord.

### III  The Testimony Regarding Chandler's Potential for Violence

█ Purnell also asserts that a new trial is warranted because the district court erred in allowing Lord to testify about the crime for which Chandler was convicted, arguing it should have been excluded under Fed.R.Evid. 403, which requires balancing the probative value of relevant evidence against the danger of unfair prejudice, confusion of the issues, or misleading the jury. Specifically, Purnell objects to Lord's testimony that: "Ms. Chandler was incarcerated at Bedford Hills for attempted murder. She struck a man in the back with an axe, and then when he survived she got two teenagers to try to shoot him."

Evidentiary rulings under Rule 403 are reviewed under an abuse of discretion standard. *See United States v. Simmons*, 923 F.2d 934, 948 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991); *United States v. Birney*, 686 F.2d 102, 106 (2d Cir.1982). Balancing relevance against prejudice is the province of the trial court, and its determination will not be overturned unless arbitrary or irrational. *See United States v. Bilzerian*, 926 F.2d 1285, 1296 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991); *United States v. Esdaille*, 769 F.2d 104, 108 (2d Cir.), *cert. denied*, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).

█ Here, Superintendent Lord's testimony regarding the facts underlying Chandler's conviction was relevant to the critical issue of the reasonableness of Lord's termination of Purnell's correspondence privilege. It was directly probative of the potential for violence that Lord asserted as a justification for her action. While it may well have carried prejudice to the jury, finding its relevance outweighed its possible prejudice is not arbitrary. We see no abuse of discretion in the admission of this testimony.

### IV  The Closing of the Courthouse Due to a Bomb Threat Prior to Jury Deliberations

█ Purnell also insists that the day-long closing of the courthouse as a result

of a bomb threat on the day jury deliberations were to begin deprived him of a fair trial. He asserts that, concerned about its own security in light of the bomb scare, the jury may have felt vulnerable and unreasonably sympathetic to the defense argument that defendant Lord needed broad discretion to do whatever she thought was appropriate in the name of security.

A trial court ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that its verdict is a miscarriage of justice. *See Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 370 (2d Cir.1988); *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 691 (2d Cir.1983). The denial of a motion for a new trial will not be overturned unless the denial constituted a clear abuse of discretion. *See, e.g., Smith*, 861 F.2d at 370; *Bauer v. Raymark Industries, Inc.*, 849 F.2d 790, 792 (2d Cir.1988).

The district court was in the best position to assess the effect that the bomb scare had on the jury. It repeated the portion of the instructions relating to the substantive law of Purnell's First Amendment claim before the jury began its deliberations. The verdict, as discussed above, was reasonable. Nothing in the record suggests that the jury's deliberations were tainted as a result of this incident. The denial of the motion for a new trial was not therefore an abuse of the trial court's broad discretion.

## CONCLUSION

The order of the district court is accordingly affirmed.